**ALSTON & BIRD LLP**
Gerard S. Catalanello
James J. Vincequerra
William Hao
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Email: Gerard.Catalanello@alston.com
       James.Vincequerra@alston.com
       William.Hao@alston.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) CHAPTER 11 |
| | ) |
| K.G. IM, LLC, *et al.*,[1] | ) |
| | ) CASE NO. 20-11723 |
| Debtors. | ) |
| | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF GERALD KATZOFF PURSUANT TO LOCAL
BANKRUPTCY RULE 1007-2 AND 9077-1 IN SUPPORT OF A HEARING
ON SHORTENED NOTICE ON THE DEBTOR'S FIRST DAY MOTIONS**

Gerald Katzoff, under penalties of perjury, hereby declares and states as follows:

1.   I am the Chairman and Manager of each of the above captioned debtors (the "**Debtors**" or the "**Company**") and I submit this Declaration pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), include: K.G. IM, LLC (8556); Il Mulino USA, LLC (1682); IM LLC – III (2613); IMNYLV, LLC (9805); IM NY, Florida, LLC (9385); IM NY, Puerto Rico, LLC (0901); IMNY AC, LLC (5082); IM Products, LLC (0303); IM Long Island Restaurant Group, LLC (1623); IM Long Island, LLC (1488); IM Franchise, LLC (0565); IM 60th Street Holdings, LLC (8040); IM Broadway, LLC (4335); and IMNY Hamptons, LLC (0423). For the purpose of these chapter 11 cases, the service address for the Debtors is: 1761 Yardley Langhorne Rd Yardley PA 19067.

LEGAL02/39932129v7

pursuant to Local Rule 9077-1 in support of the Debtors' motions and applications filed substantially simultaneous with this Declaration (the "**First Day Motions**").

2.      I have been Chairman, Manager and a co-owner of the Debtors since 2002.  I have over 30 years of experience acquiring, developing and expanding world class luxury brands.

3.      Il Mulino is one of the country's premier Italian luxury dining restaurant brands. The Il Mulino family of restaurants comprises four distinct concepts—Il Mulino New York, Trattoria Il Mulino, Il Mulino Prime, and Bistecca by Il Mulino—and sixteen locations across the United States and Puerto Rico.

4.      These chapter 11 cases, however, have only been commenced for following seven locations: (i) the Il Mulino New York location in Las Vegas, Nevada, operated by Debtor IMNYLV, LLC, (ii) the Il Mulino New York location in Miami Beach, Florida, operated by Debtor IM NY, Florida, LLC, (iii) the Il Mulino New York location in Puerto Rico, operated by Debtor IM NY, Puerto Rico, LLC, (iv) the Il Mulino New York and Trattoria Il Mulino locations located in Atlantic City, New Jersey, operated by Debtor IMNY AC, LLC, (v) the Il Mulino New York location in Roslyn, New York, operated by Debtor IM Long Island Restaurant Group, LLC, and (vi) the Il Mulino New York location in East Hampton, New York, operated by Debtor IMNY Hamptons, LLC (collectively the "**Restaurant Operator Debtors**").

5.      To be clear, none of the remaining restaurants in the Il Mulino family, including the original flagship Il Mulino location in New York's Greenwich Village (the "**Original Restaurant**"), the Il Mulino location at 60th Street in Uptown New York, the Il Mulino location in Tribeca, New York  or the Il Mulino Prime locations in Soho and Gramercy, New York have commenced bankruptcy proceedings and are not a part of these chapter 11 cases.  Specifically,

2

the following is a list of all of the restaurants that are not part of these chapter 11 cases (collectively, the "**Non-Debtor Il Mulino Restaurants**"):

| Non-Debtor Il Mulino Restaurants | Location |
|---|---|
| Il Mulino New York | Greenwich Village<br>86 West Third Street<br>New York, New York |
| | Uptown<br>37 East 60th Street<br>New York, New York |
| | Tribeca<br>361 Greenwich Street<br>New York, New York |
| | Boca Raton<br>451 E. Palmetto Park Rd.<br>Boca Raton, Florida |
| Il Mulino Prime | Gramercy<br>43 East 20th Street<br>New York, New York |
| | Soho<br>331 West Broadway<br>New York, New York |
| Trattoria Il Mulino | Orlando<br>1200 Epcot Resorts Blvd<br>Lake Buena Vista, Florida |
| | Nashville<br>144 Fifth Avenue South<br>Nashville, Tennessee |
| Bistecca by Il Mulino | Mount Airy Casino Resort<br>312 Woodland Road<br>Mount Pocono, Pennsylvania |

6.     The Non-Debtor Il Mulino Restaurants **are not** parties to the Term Loan Credit Agreement (defined below), nor are any of their assets subject to any lien or security interest held by BSP (defined below).

7.     Debtor Il Mulino USA, LLC has an equity interest in each of the Non-Debtor Il Mulino Restaurants, with the exception of the Original Restaurant that is owned by parties other than the Debtors.

3

8. In addition to the Restaurant Operator Debtors, several affiliated debtors are also included in these chapter 11 filings, including Debtor K.G. IM, LLC, which is the sole manager of each of the other Debtor entities.

## BACKGROUND

### I. The Debtors' Businesses

9. The Original Restaurant, which is not the subject of these bankruptcy proceedings, was established in 1981 in Greenwich Village. Il Mulino New York serves authentic Abruzzo regional cuisine and has been an iconic luxury Italian restaurant brand for decades. In 2004, Il Mulino New York began expanding its locations. By 2007, Il Mulino New York had expanded to 5 locations. Also, in 2007, the first Trattoria Il Mulino location opened in Orlando, Florida. The Trattoria Il Mulino concept leverages the fine dining tradition of Il Mulino New York and marries it with a modern, industrial and more relaxed atmosphere. Trattoria Il Mulino brings many of the Abruzzi-inspired classic recipes of Il Mulino New York to a wider audience in a more casual setting. There are currently three (3) Trattoria Il Mulino locations across the United States.

10. In 2014, the Il Mulino brand was further expanded with the opening of the first Il Mulino Prime location in New York City. Il Mulino Prime embraces the signature style and tradition of Il Mulino New York in a modern steakhouse. Il Mulino Prime serves homemade pastas and modern Italian classics with an emphasis on Prime cuts and freshly caught seafood from the grill. There are currently two (2) Il Mulino Prime locations, both located in New York City.

11. The Debtors do not own any intellectual property, but rather license the "Il Mulino" brand from IM LLC-1 ("**IM-1**"). IM-1 is not a debtor before this Court, it is not a party

to the Term Loan Credit Agreement (defined below), nor are any of its assets subject to any lien or security interest held by BSP (defined below). The Debtors do not have any equity interest in IM-1.

## II.    The Debtors' Capital Structure

*A. The Term Loan Credit Facility*

12.     Debtor Il Mulino USA, LLC, (the "**Il Mulino USA**") is the borrower under that certain Credit Agreement dated as of June 15, 2015 (as amended, the "**Term Loan Credit Agreement**"), with certain lenders (collectively, the "**Prepetition Term Lenders**") and BSP Agency, LLC, as agent ("**BSP**," and together with the Prepetition Term Lenders, the "**Prepetition Term Loan Parties**"). Each of the Debtors listed on **Exhibit A** hereto are guarantors with respect to the Credit Agreement (the "**Guarantor Debtors**"). The obligations of Il Mulino USA and the Guarantor Debtors with respect to the Term Loan Credit Agreement are secured by substantially all of their respective assets. It is my understanding that BSP was a division of Providence Equity and is now owned by Franklin Templeton.

13.     The principal amount borrowed under the Term Loan Credit Agreement was up to $30,000,000, but the initial proceeds were only $21,000,000. The balance of the proceeds ($9,000,000) were intended to be drawn by Il Mulino USA as and when needed to open new restaurants and otherwise grow the Il Mulino brand. Indeed, it was clear to BSP that, absent such continued growth, Il Mulino USA would not have sufficient revenues to service the debt to BSP or satisfy the debt at maturity in June 2020.

14.     Unfortunately, as will be further discussed during the course of these cases, BSP did not allow Il Mulino access to the additional undrawn amounts the company needed to grow and, instead, dribbled out additional amounts totaling $5,000,000 in a manner that was not in

5

accordance with the intent of the loan agreement or the business plans advanced by management. Most importantly, BSP's failure to fund the balance of the proceeds of the Term Loan Credit Agreement as needed was a constant pressure point for the restaurants and created ongoing liquidity constraints that caused serious operational problems during the course of the past five (5) years.

15. On or about September 26, 2019, the Debtors, at the insistence of BSP, engaged Mackinac Partners LLC ("**Mackinac**") provide advisory services and as Chief Financial Officer. As of the Petition Date, Mr. Craig Boucher of Mackinac has been serving as the Chief Financial Officer of the Debtors and has been in that role since August 2019.

16. The amount alleged by BSP to be outstanding under the Term Loan Credit Agreement as of the Petition Date, including interest and costs, is approximately $35,000,000.

*B. The IMNY AC Facility*

17. Debtor IMNY AC, LLC is the borrower under that certain Loan and Security Agreement dated as of April 23, 2018 (as amended, the "**IMNY AC Loan Agreement**"), with certain lenders (the "**IMNY AC Lenders**") and BSP, as agent (together with the IMNY AC Lender, the "**IMNY AC Loan Parties**").

18. The amount alleged by BSP to be outstanding under the IMNY AC Loan Agreement as of the Petition Date, including interest and costs, is approximately $650,000.

*C. IMNY Hamptons Facility*

19. Debtor IMNY Hamptons, LLC is the borrower under that certain Loan and Security Agreement dated as of April 27, 2018 (as amended, the "**IMNY Hamptons Loan Agreement**," together with the Term Loan Credit Facility and IMNY AC Loan Agreement, the "**Pre-Petition Loan Facilities**"), with certain lenders (the "**IMNY Hamptons Lenders**") and

BSP, as agent (together with the IMNY Hamptons Lenders, the "**IMNY Hamptons Loan Parties**").

20. The amount alleged by BSP to be outstanding under the IMNY Hamptons Loan Agreement as of the Petition Date, including interest and costs, is approximately $650,000.

**III.    Events Leading Up To Chapter 11**

*A.  Impact of Covid-19*

21. Beginning with the stay at home order issued for the State of New York in mid-March in response to the Covid-19 pandemic, Il Mulino locations across the country were forced to close and cease operations.

22. On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("**CARES Act**"), which included the Paycheck Protection Program ("**PPP**").

23. BSP strongly encouraged me to apply for funds under the PPP given the lack of revenues at the restaurants, the uncertainly surrounding the re-opening of any of the locations and its unwillingness to continue to fund any amounts under the Term Loan Credit Agreement. BSP was also fully aware of the restrictions placed upon private equity and hedge funds under the PPP and, therefore, needed me to participate in the application process. As part of the process, the Debtors needed to certify the economic necessity of the PPP loans to their businesses.

24. In addition, the Debtors have also explored insurance recoveries in connection with the Covid-19 pandemic. Specifically, the Debtors filed claims on their business interruption insurance policies and have retained counsel to pursue recoveries on those claims. BSP was aware of and encouraged the Debtors' pursuit of such claims.

25. I reached out to personal bank contacts on behalf of the restaurants and the Debtors applied for and, by May 7, 2020, received approximately $2,300,000 in PPP funds (the "**PPP Funds**"). The PPP Funds are not subject to any liens or security interests.

26. The Debtors intend to utilize the PPP Funds to help finance operations during these chapter 11 cases. Because six of the seven locations that are the subject of these cases are currently closed, and Long Island and Miami are operating in a limited capacity, the PPP Funds help provide the Debtors with a sufficient liquidity runway at this time.

    B. *Decision to Commence Chapter 11 Cases*

27. By securing PPP Funds, I strongly believed that the Debtors were well on their way to stabilize operations, protect the "Il Mulino" brand and otherwise manage through the Covid-19 crises. Importantly, I was confident that the funding providing by the government would also allow the Debtors to continue their efforts to identify a path forward with regard to satisfying the amounts due to BSP under the Term Loan Credit Agreement, which efforts began in late 2019 and were continuing up until the lockdown. Unfortunately, after the Debtors secured the PPP Funds, it became painfully clear that BSP had other plans for the restaurants. Prior to that time, I had multiple discussions with representatives from BSP regarding the businesses and there were no indications that BSP had any intention of seeking to attempt to exercise any control of the Debtors.

28. In this regard, almost immediately after Il Mulino succeeded in securing PPP Funds, BSP began to take actions and implement plans that were aimed at, among other things (i) exercising control over the Company, (ii) using the PPP Funds to "fund" operations after exercising control, and (iii) putting in place a path for BSP to wipe out all stakeholders in a "debt" to "equity" conversion play without allowing the Debtors the chance to stabilize

8

operations and run a fair and transparent process toward finding an exit out of the Covid-19 lockdown and the consequential financial impact that crippled the companies. Simply put, it was clear that BSP viewed the Covid-19 impact as a chance to unfairly leverage the Debtors and seize control of the restaurants in a manner that is not consistent with the rights afforded the parties under the Term Loan Credit Agreement or applicable law.

29. For example, on June 2, 2020—*before the June 15, 2020 scheduled maturity of the Term Loan Credit Agreement*—BSP delivered notices to certain of the Debtors alleging certain events of default with respect to the Term Loan Credit Agreement and asserting that it had some type of "voting control" over certain of the Debtors. In response, the Debtors advised BSP that they disputed that events of default existed and, equally important, pointed out that the applicable loan documents did not provide BSP with any meaningful voting control to remove managers or otherwise take control over the operations of the restaurants. While it is possible that BSP was not aware of this fact at that time, over a period of weeks the Debtors made it crystal clear to BSP that it did not have any voting rights with regard to Debtor K.G. IM, LLC, which is the sole manager vested with complete operational control of each of the other Debtor entities. Unfortunately, BSP would not be deterred and continued to insist that it had rights that simply do not exist under the Term Loan Credit Agreement or otherwise.

30. While the Debtors attempted to negotiate a resolution with BSP before filing these cases, those negotiations were ultimately unsuccessful. The Il Mulino restaurants that are the subject of these chapter 11 cases are part of an iconic brand with significant growth potential. BSP, however, has attempted to exploit the unavoidable consequences of the Covid-19 pandemic and its impact on restaurants like Il Mulino in an effort to take control of the Debtors and their

9

assets at a point in time when the Debtors' businesses have been stressed to an unprecedented extent. That, of course, is grossly unfair.

31. The Debtors, therefore, have commenced these chapter 11 cases in order to curtail those efforts and to further explore various restructuring alternatives. Indeed, given the aggressiveness of BSP and its continuation of taking actions inconsistent the rights afforded to it under the Term Loan Credit Agreement, the Debtors were forced to file for protection on shortened notice to protect their assets.

32. The Debtors intend to resume operations at currently closed locations as soon as it is permissible and return to profitability. The Debtors will utilize the chapter 11 process to restructure its debt, seek out new financing opportunities, explore potential transactions, and liquidate claims. I believe that these chapter 11 proceedings are necessary and in the best interest of the Debtors, their estates, and all stakeholders, including the creditor body.

### IV. First Day Motions

33. The Debtors anticipate filing a number of "first day" motions and applications over the coming days. In that regard, I expect that I will be filing a supplement to this Declaration in support of those pleadings, including a motion to address certain limited pre-petition payroll, a motion to permit the Debtors' to continue to use existing bank accounts and business forms, and applications to retain Traxi LLC as financial advisors and the law firm Davis & Gilbert as special corporate counsel to work with me and the Debtors during the pendency of these cases.

34. However, simultaneously with the filing of the Debtors' chapter 11 petitions, the Debtors have filed the following motions and applications:

   A. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief* (the "**Joint Admin Motion**")

10

35. The Joint Admin Motion seeks the consolidation of the chapter 11 cases for procedural purposes only.

36. This will allow the efficient and cost-effective administration of the chapter 11 cases. The Debtors have been operated as, essentially, a conglomerate with mostly common ownership, management and capitalization.

37. The Joint Admin Motion will help facilitate the effective and efficient administration of the chapter 11 cases pending hopeful confirmation of a plan of reorganization.

B. *Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs and (II) Granting Related Relief* (the "**Motion to Extend Time to File Schedules and Statements**")

38. The Motion to Extend Time to File Schedules and Statements seeks to extend the deadline by which the Debtors must file its schedule of assets and liabilities, schedule of current income and expenditures, schedule of executory contracts and unexpired leases, and statement of financial affairs by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown.

39. To prepare the Schedules and Statements, the Debtors must gather information from books, records, and documents relating to a multitude of transactions. Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' already over-burdened employees. The efforts of its employees during the initial stages of this case is critical and need to be focused on attending to the Debtors' business and maximizing the value of the Debtors' estates.

40. Given the size, geographical spread and complexity of the Debtors' businesses and financial affairs and the critical matters that the Debtors' management and professionals were required to address prior to the Petition Date, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.

41. For these reasons, the Debtors will be unable to compile all the information necessary for the preparation and filing of the Schedules and Statements within fourteen days after the entry of the order for relief, as required by Bankruptcy Rule 1007(c). The Debtors will begin working diligently to assemble and collate the necessary information. I anticipate that the Debtors will need a minimum of thirty (30) additional days beyond those otherwise prescribed by the Bankruptcy Rules in order to prepare and file its Schedules and Statements in the appropriate format.

[*Rest of the page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: July 28, 2020

_____
Gerald Katzoff
Manager

13

# EXHIBIT A

## Guarantor Debtors

K.G. IM, LLC

IM LLC – III

IMNYLV, LLC

IM NY, Florida, LLC

IM NY, Puerto Rico, LLC

IMNY AC, LLC

IM Products, LLC

IM Long Island Restaurant Group, LLC

IM Long Island, LLC

IM Franchise, LLC

IM 60th Street Holdings, LLC

IM Broadway, LLC