**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

In re:                                                      **FOR PUBLICATION**

                                                            Chapter 11

K.G. IM, LLC, *et al.*,[1]

                                                            Case No. 20-11723 (MG)

                                        Debtors.            (Jointly Administered)

----------------------------------------------------------------x

### MEMORANDUM OPINION (I) GRANTING IN PART AND DENYING IN PART MOTION OF THE UNITED STATES TRUSTEE TO RECONSIDER AND VACATE THE STIPULATION AND ORDER APPOINTING CRO AND ESTABLISHING OPERATING PROTOCOL FOR THE DEBTORS AND (II) APPROVING DEBTORS' APPLICATION TO EMPLOY MACKINAC PARTNERS, LLC AND AFFIRM DESIGNATION OF MR. BOUCHER AS DEBTORS' CRO

*A P P E A R A N C E S :*

ALSTON & BIRD LLP
*Counsel to Debtors and Debtors-in-Possession*
90 Park Avenue
New York, NY 10016
By:    Gerard S. Catalanello, Esq.
       William Hao, Esq.

GOODWIN PROCTER LLP
*Counsel to BSP Agency, LLC,*
*Providence Debt Fund III L.P.,*
*Benefit Street Partners SMA-C L.P.,*
*Benefit Street Partners SMA LM L.P.,*
*Providence Debt Fund III Master (Non-US) Fund L.P.,*
*and Benefit Street Partners SMA C SPV L.P.*
The New York Times Building
620 Eighth Avenue
New York, NY 10018

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), include: K.G. IM, LLC (8556);Il Mulino USA, LLC (1682); IM LLC – III (2613); IMNYLV, LLC (9805); IM NY, Florida, LLC (9385); IM NY, Puerto Rico, LLC (0901); IMNY AC, LLC (5082); IM Products, LLC (0303); IM Long Island Restaurant Group, LLC (1623); IM Long Island, LLC (1488); IM Franchise, LLC (0565); IM 60th Street Holdings, LLC (9997); IM Broadway, LLC (4335); IMNY Hamptons, LLC (0423), and IM Payroll, LLC (0807). For the purpose of these chapter 11 cases, the service address for the Debtors is: 1761 Yardley Langhorne Rd., Yardley, PA 19067.

By:    Michael H. Goldstein, Esq.
       Howard S. Steel, Esq.

WESTERMAN BALL EDERER MILLER
ZUCKER & SHARFSTEIN, LLP
*Counsel to Gerald Katzoff*
1201 RXR Plaza
Uniondale, NY 11556
By:    Thomas A. Draghi, Esq.

JONES DAY
*Counsel to Boardwalk 1000, LLC and*
*HR Atlantic City Lender, LLC*
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
By:    Dan Moss, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
201 Varick Street, Suite 1006
New York, NY 10014
By:    William K. Harrington, Esq.
       Benjamin J. Higgins, Esq.
       Shannon Anne Scott, Esq.


# **INTRODUCTION**

Pending before the Court is the United States Trustee's (the "UST") *Motion for*

*Reconsideration of the Stipulation and Order Appointing Chief Restructuring Officer and*

*Establishing Operating Protocol for the Debtors*.  ("Reconsideration Motion," ECF Doc. # 86.)

The Debtors and BSP[2] filed responses and declarations in opposition to the Reconsideration

Motion.  ("Debtors' Objection," ECF Doc. # 136; "Catalanello Declaration," ECF Doc. # 138;

"BSP Objection," ECF Doc. # 137; "Dasaro Declaration," ECF Doc. # 139; "Supplemental

Catalanello Decl.," ECF Doc. # 156.)  The UST filed a supplemental memorandum of law

---

[2]    BSP Agency, LLC, Providence Debt Fund III L.P., Benefit Street Partners SMA-C L.P., Benefit Street Partners SMA LM L.P., Providence Debt Fund III Master (Non-US) Fund L.P., and Benefit Street Partners SMA-C SPV L.P. (collectively, "BSP").  BSP is the Debtor's prepetition secured lender.

("Supplemental Brief," ECF Doc. # 121) and a reply to the oppositions ("UST Reply," ECF Doc. # 145).

Also before the Court is the *Debtors' Application for an Order to (I) Employ Mackinac Partners, LLC and (II) Affirm Designation of Craig M. Boucher as Chief Restructuring Officer, Effective as of August 14, 2020.* ("CRO Retention Application," ECF Doc. # 84.) The UST filed an objection ("UST's Objection," ECF Doc. # 134) and the Debtors filed a reply ("Reply," ECF Doc. # 147). BSP joins in the Debtors' Reply. (ECF Doc. # 149.)

The issues having been fully briefed, and the Court held a telephonic hearing on September 22, 2020 via CourtSolutions to consider the Reconsideration Motion and the CRO Retention Application. After hearing from the parties, the Court ruled from the bench as follows: **(i)** the Reconsideration Motion was **GRANTED** in part and **DENIED** in part; and **(ii)** the UST's Objection was **OVERRULED** and the CRO Retention Application was **APPROVED**.

On September 28, 2020, orders were entered with respect to both of the rulings. (*See* ECF Doc. ## 166, 167.) The Court issues this memorandum decision to further explain its reasoning.

## I.    BACKGROUND

On July 28, 2020 ("Petition Date"), K.G. IM, LLC and certain affiliated entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[3] The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. (Debtors'

---

[3]     On July 31, 2020, an additional Debtor, IM Payroll, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Objection ¶ 4.)  No trustee, examiner, or official committee of unsecured creditors has been
appointed.  (*Id.*)

The Debtors own and operate certain Il Mulino restaurants—one of the country's premier
Italian luxury dining brands.  The Il Mulino family of restaurants comprises sixteen locations
across the United States and Puerto Rico.  ("Katzoff Decl.," ECF Doc. # 4 ¶ 3.)  These chapter
11 cases, however, have only been commenced for seven Il Mulino locations (collectively, the
"Restaurant Operator Debtors").[4]  In addition to the Restaurant Operator Debtors, several
affiliated non-operating entities are also debtors in these chapter 11 proceedings.

Debtor K.G. IM, LLC ("K.G. IM") is the indirect parent of the Debtors.  ("Supp. Katzoff
Decl.," ECF Doc. # 15 at 13.)  With the exception of debtor IMNY Hamptons, LLC ("IMNY
Hamptons"), K.G. IM is the sole "Manager" of the Debtors (the "K.G. Managed Debtors")[5].  J.B.
IM, LLC ("J.B. IM") is the "Manager" of IMNY Hamptons.[6]  K.G. IM and J.B. IM are majority
owned by Gerald Katzoff and Brian Galligan.  (*See* Supp. Katzoff Decl. at 13.)

Messrs. Katzoff and Galligan are "Co-Managers" of K.G. IM and J.B. IM.  (*See* "K.G.
IM Operating Agreement," ECF Doc. # 138-18; "J.B IM Operating Agreement," ECF Doc. #
138-20.)  On August 14, 2020, as further discussed below, both Katzoff and Galligan executed
the CRO Stipulation (defined below), agreeing to vest management authority with respect to

---

[4]       Specifically, the seven Restaurant Operator Debtors include (i) the Il Mulino New York location in Las
Vegas, Nevada, operated by Debtor IMNYLV, LLC, (ii) the Il Mulino New York location in Miami Beach, Florida,
operated by Debtor IM NY, Florida, LLC, (iii) the Il Mulino New York location in Puerto Rico, operated by Debtor
IM NY, Puerto Rico, LLC, (iv) the Il Mulino New York and Trattoria Il Mulino locations located at Atlantic City,
New Jersey, operated by Debtor IMNY AC, LLC, (v) the Il Mulino New York location in Roslyn, New York,
operated by Debtor IM Long Island Restaurant Group, LLC, and (vi) the Il Mulino New York location in East
Hampton, New York, operated by Debtor IMNY Hamptons, LLC.  (*Id.* ¶ 4.)
[5]       Each of the K.G. Managed Debtors' operating agreements provides: "The business and affairs of the
Company shall be managed by K.G. IM, LLC (the 'Manager').  The Manager is hereby designated as the sole
manager of the Company."  (*See e.g.*, "IMNY AC LLC Agreement," ECF Doc. # 138-10 § 3.1.)
[6]       IMNY Hamptons' operating agreement provides: "The business and affairs of the Company shall be
managed by J.B. IM, LLC (the 'Manager').  The Manager is hereby designated as the sole manager of the
Company."  ("IMNY Hamptons LLC Agreement," ECF Doc. # 138-19 § 3.1.)

4

K.G. IM and, accordingly, K.G. IM's management authority over the K.G. IM Managed Debtors

to Mackinac Partners, LLC ("Mackinac," or the "CRO"). (*See* "CRO Stipulation," ECF Doc. #

59-1.) Pursuant to the CRO Stipulation, both Katzoff and Galligan also agreed to vest

management authority with respect to J.B. IM, solely as to Debtor IMNY Hamptons, in the CRO.

(*See id.*)

### A. Stay Relief Motion

Prior to the Petition Date, BSP declared an event of default under certain credit

agreements with the Debtors and sought enforcement of its right under those agreements to

exercise the authority of K.G. IM to manage the Debtors. (*See* ECF Doc. # 19 at ¶¶ 3–10.) The

Debtors voluntary chapter 11 petitions were filed without prior notice to, or knowledge of, BSP.[7]

(*See id.* ¶ 10; "First Day Hr'g Tr.," ECF Doc. # 49 at 23:11–15.)

On August 3, 2020, BSP filed a *Motion for an Order Granting Relief from the Automatic
Stay* (the "Stay Relief Motion," ECF Doc. # 19) and a *Declaration of King Jang in Support of the
Stay Motion* ("Jang Declaration," ECF Doc. # 20). The Stay Relief Motion and Jang

Declaration, *inter alia*, alleged that Katzoff was not authorized on behalf of K.G. IM to file

voluntary chapter 11 petitions for the K.G. IM Managed Debtors and sought relief from the

automatic stay to (i) authorize BSP to ratify the chapter 11 cases for all of the Debtors except

K.G. IM and IMNY Hamptons and to confirm its authority to exercise management rights of

K.G. IM and IMNY Hamptons that was pledged pre-petition to BSP; and (ii) to permit BSP to

exercise its rights and remedies with respect to certain collateral of the Debtors. (Stay Relief

Motion ¶ 81.)

---

[7]        The Debtors' chapter 11 petitions were signed by Katzoff.

BSP sought to have the Stay Relief Motion heard on shortened notice on August 5, 2020. (*See* ECF Doc. # 23.)  On August 4, 2020, the Court denied BSP's request and instead ordered BSP and the Debtors to confer and submit a proposed stipulation and order setting forth a schedule to litigate the Stay Relief Motion.  (*See* ECF Doc. # 27.)  BSP and the Debtors were unable to reach a mutual resolution and submitted competing proposed scheduling orders (the "Scheduling Orders").  (*See* ECF Doc. ## 35, 36.)

## B.  First Day Hearing

On August 25, 2020, the Court held a hearing on certain of the Debtors' first day motions (the "First Day Hearing") and addressed, *inter alia*, the Scheduling Orders with respect to the Stay Relief Motion.  The UST appeared at the First Day Hearing.  (First Day Hr'g Tr. at 9:15–16.)  Before hearing from the parties, the Court said it was considering entering an order to show cause whether a chapter 11 trustee should be appointed, either for cause under section 1104(a)(1) or in the interests of the estate under section 1104(a)(2).  (*Id.* at 45–46.)  The Debtors' counsel indicated that the Debtors had selected a proposed restricting officer, but had not conferred with BSP's counsel about the selection.

After hearing from counsel, the Court stated that neither side's proposed Scheduling Order for the Stay Relief Motion was acceptable and observed that the parties were headed towards a "death march."  (*Id.* at 60:15–18.)  Ultimately, the Court suggested that, before heading down a path of extensive litigation over the Stay Relief Motion, BSP and the Debtors should meet and confer regarding the selection of a chief restructuring officer and implementation of case operating protocols.  (*Id.* at 48:1–4; 62–63.)  The Court directed BSP and the Debtors to file a status letter on the docket by Monday, August 10, 2020, addressing whether

6

the parties were able to reach a consensual agreement (the "CRO Agreement Deadline").  (*Id.* at 62–63.)

### C.  Settlement of the Stay Relief Motion

After the First Day Hearing, BSP and the Debtors engaged in discussions concerning a resolution of the Stay Relief Motion.  (Debtors' Objection ¶ 14; BSP Objection ¶ 18.)  On August 10, August 11, and August 12, BSP and the Debtors filed joint status letters (the "Joint Status Letters") providing updates on the status of chief restructuring officer selection and case protocol negotiations.  (*See* ECF Doc. ## 50, 53, 56.)  Copies of each Joint Status Letters were served on the UST electronically through the Court's CM/ECF system and via First Class Mail. (*See* ECF Doc. # 64.)  The UST raised no formal or informal objections in response to the Joint Status Letters.  (BSP Objection ¶ 19.)

On August 13, 2020, BSP and the Debtors filed a final joint status letter reporting that the parties reached an agreement regarding the selection of a chief restructuring officer and implementation of case operating protocols.  ("Final Status Letter," ECF Doc. # 59.)  Annexed to the Final Status Letter was the CRO Stipulation.  On August 13, 2020, the UST and all ECF parties received a copy of the Final Status Letter and CRO Stipulation through the Court's CM/ECF System.  (*See* ECF Doc. # 97.)  On August 14, 2020, the Court entered the CRO Stipulation.  ("Stipulation and Order," ECF Doc. # 60.)

### D.  The Stipulation and Order

The Stipulation and Order, *inter alia*, appointed Mackinac as the chief restructuring officer of the Debtors, with Mr. Craig Boucher of Mackinac performing the duties of the CRO on behalf of Mackinac.  (*See* Stipulation and Order § I.A.)  The Stipulation and Order vested in the CRO "all of the powers and duties to operate the Debtors' business" (*id.* § II.A.) and granted the

7

CRO "sole and exclusive power to exercise all of the management, voting rights, consent rights and powers of each of the Debtors, without regard to, or requirement of, any management, voting rights, consent rights, consultation rights or powers of any person who has any such rights or powers under any of the Debtors' Operating Agreements . . . ." (*Id.* § II.B.)  Each of the Debtors, Katzoff, Galligan, and J.B. IM, solely in its capacity as manager of Debtor IMNY Hamptons, "expressly consent[ed] to the appointment of the CRO and expressly and irrevocably waive[d] any such management, voting rights, consent rights, consultation rights or powers any of them may have with respect to any of the Debtors . . . ." (*Id.* § II.C.)

The Stipulation and Order also required Debtors' counsel to prepare and file an application to employ the CRO.  (*Id.* § I.B.)  On August 28, 2020, the Debtors filed the CRO Retention Application to employ and retain Mackinac pursuant to sections 363(b) and 105(a) of the Bankruptcy Code and affirm Boucher as CRO effective as of August 14, 2020.  Mackinac began discharging its duties as CRO of the Debtors immediately after entry of the Stipulation and Order.  (*See id.* §§ I.A–B.)  By all accounts, appointment of the CRO has stabilized these chapter 11 proceedings and BSP and the Debtors have been working collaboratively to resolve several operational, financial, and administrative motions.[8]  (*See* BSP Objection ¶ 22.)

Under the parties' Engagement Letter, Mackinac would perform "crisis management services" and Boucher would be appointed CRO of the Debtors.  (CRO Retention Application ¶ 10; "Engagement Letter," ECF Doc. # 84-1 at 11.)  The terms of the engagement make Boucher

---

[8]    *See e.g.*, "Second Day Hr'g Tr.," ECF Doc. # 162 at 28:12–29:1–10 (Debtors counsel stated: "I would say, without question, Your Honor, that Mr. Boucher, his involvement has been a very positive one for the debtors's[sic] estates, and that he has been working very constructively with BSP to continue to advance these cases to what I would say a more stable air, for lack of a better term. . . .  There is a very good course of communication among the principles, as well as among the professionals.  As we said at the outset, we've been working on a longer-term cash collateral DIP financing, providing liquidity to fund these cases.  We're hopefully very close to getting something filed on court hopefully this week to provide a framework for financing, as well for a resolution and a process for that to go forward.  And we feel that that resolution, our relief from stay motion, has been very productive and helpful for these cases.").

8

the "sole representative of the Debtors' estates" and vest him "with all of the powers and duties to operate the Debtors' businesses pursuant to Bankruptcy Code Sections 1107 and [1108]." (CRO Retention Application ¶ 10.)  The Engagement Letter explicitly states that "[the CRO] shall be an independent fiduciary with respect to each of the Debtors' estates."  (Engagement Letter at 12.)

On September 22, 2020, Messrs. Katzoff and Galligan executed written consent resolutions and an amendment to the K.G. IM operating agreement to (i) effectuate the Stipulation and Order, (ii) provide that Katzoff and Galligan resign as managers of K.G. IM, and (iii) name the CRO the sole Manager of K.G. IM.  (*See* "Written Consent Resolutions and Amendment," ECF Doc. # 156-1 at 2, 16–18.)

### E.  The Reconsideration Motion and UST's Objection to CRO Retention Application

On August 28, 2020, prior to execution of the Written Consent Resolutions and Amendment, the UST filed the Reconsideration Motion asking the Court to reconsider entry of the Stipulation and Order and vacate same pursuant to Rules 59(e), 60(b)(1), and 60(b)(6) of the Federal Rules of Civil Procedure.  The UST favors the appointment of a chapter 11 trustee in these cases (*see* Reconsideration Motion at 2), but the UST did not file a motion for appointment of a trustee.

Among other reasons, the UST seeks reconsideration on grounds that the Stipulation and Order was entered without sufficient notice or an opportunity to object.  (*Id.* at 2–3.)  The UST asserts that the Court should vacate the Stipulation and Order because it effectuates a change at the managerial level of the Debtors' corporate governance structure without complying with applicable state law and it effectively creates a *de facto* chapter 11 trustee without any express

authorization under the Bankruptcy Code at a time where the debtors' existing management has

abrogated its fiduciary duty.  (*See id.* at 11.)

On September 11, 2020, the UST filed its Objection to the CRO Retention Application.

The UST's Objection largely presents the same arguments set forth in the Reconsideration

Motion.  Beyond that, the UST argues that the proposed retention does not abide by Part I.D of

the J. Alix Protocol, which provides that "[p]ersons furnished . . . for executive officer positions"

shall be retained upon the express approval of and be subject to the oversight of "an independent

Board of Directors whose members are performing their duties and obligations as required under

applicable law."  (*See* UST's Objection at 3.)

## II.    <u>LEGAL STANDARD</u>

### A.  Reconsideration Under Federal Rules 59(e) and 60(b)

The standard applicable to a motion for reconsideration is identical to that of a motion to

alter or amend a judgment under Federal Rule of Civil Procedure ("FRCP") 59(e).  *Henderson v.*

*Metro. Bank & Trust Co.*, 502 F. Supp. 2d 372, 375 (S.D.N.Y. 2007); *accord Samuel's Temple*

*Church of God in Christ v. Parade Place, LLC (In re Parade Place, LLC)*, 508 B.R. 863, 868–69

(Bankr. S.D.N.Y. 2014).  Rule 9023 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") incorporates FRCP 59.  *See* FED. R. BANKR. P. 9023.  FRCP 59(e) does not

provide specific grounds for amending or reconsidering a judgment.  However, "[t]he major

grounds justifying reconsideration are 'an intervening change of controlling law, the availability

of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  *In re*

*Flatbush Square Inc.*, 508 B.R. 563, 569 (Bankr. E.D.N.Y. 2014) (quoting *Virgin Atl. Airways,*

*Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  Local Bankruptcy Rule 9023-

1(a) provides that a motion for reconsideration "must set forth concisely the matters or

controlling decisions which counsel believes the Court has not considered." BANKR. S.D.N.Y. R.
9023-1(a).

In addition to Bankruptcy Rule 9023, parties can seek relief from a judgment or order
under Bankruptcy Rule 9024. Bankruptcy Rule 9024 makes FRCP 60 applicable in bankruptcy
cases. "[A]ll orders of the bankruptcy court are subject to Rule 60 F.R.CIV.P." FED. R. BANKR.
P. 9024, advisory committee note. FRCP 60 contains six grounds for which the court may grant
relief from an order or judgment. Those grounds are: "(1) mistake, inadvertence, surprise,
excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or misconduct;
(4) the judgment is void; (5) the judgment has been satisfied, released, discharged, or it is no
longer equitable; or (6) any other reason that justifies relief." *In re: Residential Capital, LLC*,
2015 WL 1636440, at *4 (Bankr. S.D.N.Y. Apr. 10, 2015) (internal quotations omitted) (citing
FED. R. CIV. P. 60(b)).

The bankruptcy court has broad discretion to grant relief under subpart (6) "when
appropriate to accomplish justice." *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir.
2004) (quoting *Matarese v. LeFevre*, 801 F.2d 98, 107 (2d Cir. 1986)); *see also Stevens v.
Miller*, 676 F.3d 62, 67 (2d Cir. 2012). "A motion for relief from judgment is generally not
favored and is properly granted only upon a showing of exceptional circumstances." *United
States v. International Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001) (citations omitted).
Like FRCP 59(e), change of controlling law, new evidence, and need to correct a clear error and
manifest injustice are also grounds to order relief under FRCP 60(b)(6). *Marrero Pichardo v.
Ashcroft*, 374 F.3d at 56 (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d at
1255). The party seeking relief under FRCP 60(b) bears the burden of proof. *See United States
v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001).

11

### B.  Retention of Estate Professionals Pursuant to Section 363(b)

In addition to the authority granted in section 327(a), Debtors may retain estate

professionals, including CROs, pursuant to section 363(b) of the Bankruptcy Code.  Section

363(b) provides, in relevant part, that the trustee or debtor in possession "after notice and a

hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate . . . ."  11 U.S.C. § 363(b).  A debtor in possession has broad discretion to use estate

property when such use represents a reasonable business judgment on the part of the debtor.  *See*

*Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel)*, 722 F.2d 1063, 1070 (2d Cir.

1983) (noting that a debtor must show "some articulated business justification" for using

property outside the ordinary course of business under section 363(b)).

### III.    <u>DISCUSSION</u>

### A.  The UST's Request to Reconsider Entry of the Stipulation and Order is Granted for Lack of Sufficient Notice and Opportunity to Respond

The UST has established that reconsideration of entry of the Stipulation and Order is

warranted.  The UST argues that proper notice and an opportunity to respond to the CRO

Stipulation was not provided to creditors and parties in interest, including the UST, prior to entry

of the Stipulation and Order.  Terms of the CRO Stipulation were first disclosed in the Final

Status Letter that was filed on August 13, 2020 at 9:05 p.m.  (*See* ECF Doc. # 59.)  The

Stipulation and Order was subsequently entered the next morning on August 14, 2020 at 9:17

a.m.  (*See* ECF Doc. # 60.)  While the UST acknowledges receiving notifications through ECF of

the Joint Status Letters, those filings did not contain the terms of the CRO Stipulation and did not

constitute adequate notice of the relief granted by the Stipulation and Order.  Accordingly, the

Court grants the UST's request to reconsider entry of the Stipulation and Order, and the merits

issues have been fully briefed.  Therefore, the Court will address the merits of the UST's request

to vacate the Stipulation.

### B.  The UST's Request to Vacate the Stipulation and Order is Denied Because The UST Fails to Establish Exceptional Circumstances or Other Grounds Justifying Relief

The Reconsideration Motion primarily relies on FRCP 60(b)(6) and asserts that the Court

should vacate the Stipulation and Order based on the circumstances that led to its entry and the

extraordinary relief purportedly granted therein.[9]  (*See* Reconsideration Motion at 11.)  The

"circumstances" the UST asserts is that Stipulation and Order resulted in "no-one" managing the

Debtors because they did not take the appropriate steps under state law to appoint Mackinac as

manager contemporaneously with entry of the Stipulation and Order.  (*Id.* at 12–13.)  The

"extraordinary relief" the UST asserts is that under the Bankruptcy Code, the CRO, as an estate

professional, cannot exercise all of the duties of a debtor or debtor-in-possession.  (*Id.*)  For the

reasons discussed below, the UST fails to meet its burden under FRCP 60(b)(6) to establish that

entry of the Stipulation and Order should be vacated as a matter of law.

### 1.  Messrs. Katzoff's and Galligan's Delegation of Management Authority Under the CRO Stipulation is Permissible Under State Law and the Operating Agreements

The appointment by Messrs. Katzoff and Galligan of Mackinac as manager of the

Debtors is permitted under applicable state law and the Debtors' operating agreements.  Each of

the Debtors are manager-managed limited liability companies organized under the laws of

Delaware.[10]  The manager has all managerial and operational control over the Debtors.  (BSP

Objection ¶ 10.)  The Debtors do not have a "board of directors" or "officers" to whom the

---

[9]     While the UST also moves under FRCPs 59(e) and 60(b)(1), the UST does not argue any grounds for relief under those Rules.  (*See generally* Reconsideration Motion.)

[10]    All Debtors other than IM LLC-III are organized under Delaware law.  (*See* Catalanello Declaration, Exs. F–P, R–T.)  Debtor IM LLC-III is a New York limited liability company.  (*See id.*, Ex. Q.)

manager reports.  (*See* BSP Objection ¶ 10.)  Katzoff and Galligan were the co-managers of K.G.

IM and J.B. IM, who in turn are the managers of the Debtors.

"Every Delaware LLC enjoys great flexibility in shaping its management structure."

Bishop & Kleinberger, *Limited Liability Companies: Tax and Business Law* ¶ 14.04, 2001 WL

633052; *see also In re 1031 Tax Grp I*, 2007 WL 2085384, at *4 ("Delaware Limited Liability

Company Act allows great flexibility in assignment and delegating management authority").

Under the Delaware Limited Liability Company Act (the "Delaware LLC Act"), the operating

agreement, as a contract, governs, except where applicable state law overrides the agreement.

*See Obeid v. Hogan*, No. CV 11900-VCL, 2016 WL 3356851, at *5 (Del. Ch. June 10, 2016),

judgment entered, (Del. Ch. 2016) ("It is frequently observed that LLCs 'are creatures of

contract' which they primarily are.").

Section 18-407 of the Delaware LLC Act is clear that Messrs. Katzoff and Galligan were

free to delegate their authority, unless otherwise limited by the terms of the operating agreement:

> Unless otherwise provided in the limited liability company agreement, a
> member or manager of a limited liability company has the power and
> authority to delegate to 1 or more other persons any or all of the member's
> or manager's, as the case may be, rights, powers and duties to manage and
> control the business and affairs of the limited liability company. Any such
> delegation may be to agents, officers and employees of a member or
> manager or the limited liability company, and by a management agreement
> or another agreement with, or otherwise to, other persons.

6 Del. C. § 18-407.

The operating agreements of K.G. IM and J.B. IM vest Katzoff and Galligan with full

and unfettered authority, as co-managers, with respect to those entities,[11] and do not preclude the

---

[11]    The K.G. IM operating agreement provides that "[t]he Managers shall manage the Company, and all
decisions shall be made jointly by both Managers."  (*See* K.G. IM Operating Agreement § 4.1(a).)  The J.B. IM
operating agreement provides that "[e]xcept as expressly limited by the provisions of the Agreement and the Act, the
Managing Member shall have the full, exclusive and absolute right, power and authority to manage and control the
Company and the property assets, affairs and business thereof".  (J.B. IM Operating Agreement § 5.1(a).)

14

delegation of authority of their respective managers.[12]  Messrs. Katzoff and Galligan both signed the CRO Stipulation and conveyed their management rights.  Under the Delaware LLC Act and the applicable operating agreements, Katzoff and Galligan were well within their rights as co-managers to transfer their rights as co-managers to Mackinac in settlement of the Stay Relief Motion.

The Court agrees with the Debtors and BSP that the Stipulation and Order effectively serves as an amendment to the applicable operating agreements that implements the governance changes for the Debtors set forth therein.  Nevertheless, in response to the UST Motion, Messrs. Katzoff and Galligan have effectuated the execution of formal corporate governance documents appointing Mackinac as "Manager" of the Debtors pursuant to the Written Consent Resolutions and Amendment.

The UST argues that the Written Consent Resolution and Amendment is defective because, through the Stipulation and Order, Messrs. Katzoff and Galligan waived their authority to act on behalf of the Debtors weeks prior to executing the Written Consent Resolution and Amendment.  At the same time the UST argues that the Stipulation and Order was a defective waiver of authority because the Debtors did not comply with state law formalities.  The UST cannot have it both ways.  The UST does not point to any caselaw or statutory authority to support its position that the Debtors cannot correct any supposed defect under the applicable operating agreements that may or may not have resulted from the transfer of authority under the Stipulation and Order.  The Court rejects this argument.

---

[12]    The K.G. IM Operating Agreement and the J.B. Operating Agreement provide that the manager shall hold office until he resigns or ceases to have the ability to serve as a manager due to death, liquidation, incapacity, etc. (*See* K.G. IM Operating Agreement § 4.1(d); J.B. IM Operating Agreement § 5.1(e).)  In the event the Manager resigns a new manager is appointed by the vote of 60% of the membership stake in K.G. IM. (*See* K.G. IM Operating Agreement § 4.1(d); J.B. IM Operating Agreement § 5.1(e).)

Under a similar line of reasoning, the UST argues that there was a void in management of the Debtors during the period between entry the Stipulation and Order and execution of the Written Consent Resolutions and Amendment.  According to the UST, any actions taken by the CRO during such period could have been suspect exposed the estate to liability because Mackinac was not formally granted a managerial role during that time.  However, the UST cannot point to any evidence of prejudice or harm that resulted from any confusion in authority that may have occurred during the gap period.  The Court rejects this argument.

The UST also contends that Messrs. Katzoff and Galligan were not free to delegate their authority as co-managers under the operating agreements of K.G. IM and J.B. IM. (Reconsideration Motion at 4–5; UST Reply at 4.)  In support of this argument, the UST points to Section 3.3 of the operating agreements for Debtors IMNYLV, LLC, IMNY, Florida, LLC, IMNY, Puerto Rico, LLC and IMNY AC, LLC, which provide as follows:

> Section 3.3 <u>Officers</u>. The Manager shall have the right to delegate any portion of its duties as it may determine to officers or to other person; **provided, however, that no such delegation of authority shall relieve the Manager of its obligations hereunder**.  The Manager may, from time to time, designate or appoint on more officers of the Company, including, without limitation, one or more chairmen, vice chairman, a chairman emeritus, a chief executive officer, a president, one or more vice presidents, a secretary, and/or treasurer.  Each appointed officer shall hold office until: (i) his/her successor is appointed by the Manager; (ii) such officer submits his/her resignation; or (iii) such officer is removed, with or without cause, by the Manager.  All officers shall have the authority to perform duties to conduct the day to day operations of the Company consistent with and in the ordinary course of its business **subject** to the terms and provisions of this Agreement and **to the direction and authorization of the Manager**.

(*Id.* at 5 (citing Catalanello Declaration, Exs. G, H, I, J).)  (emphasis in original.)  According to the UST, these Debtors' operating agreements preclude the "Managers" from abrogating their obligations as they have attempted to do.  The UST states that "[i]n contravention of these controlling provisions, the Stipulation and Order states that Katzoff, Galligan and J.B. IM, LLC .

. . expressly consent to the appointment of the CRO and expressly waive any such management, voting rights, consent rights, consultation rights or powers any of them may have with respect to any of the Debtors." (*Id.* (citing Stipulation and Order § II.C).)

The UST misinterprets Section 3.3 of these Debtor's operating agreements. First, Katzoff, Galligan, and J.B. IM are not the "Manager" of those Debtors. Rather, the subject operating agreements state that "[t]he business affairs of the Company shall be managed by K.G. IM, LLC (the 'Manager')." (*See, e.g.*, Catalanello Declaration, Ex. J § 3.1.) Therefore, Katzoff, Galligan, and J.B. IM have not abrogated their obligations under the operating agreements as the UST suggests. Second, even if Katzoff, Galligan, and J.B. IM were "Manager" under those operating agreements, the rights and powers that each waived pursuant to the Stipulation and Order are best understood as "duties"—not "obligations"—of the "Manager". Indeed, the only obligations of the "Manager" under those Debtor's operating agreements are to (i) act in good faith an in the best interest of the Company (*id.* § 3.4) and (ii) execute and cause to be filed certain documents in connection with termination of the Company (*id.* § 5.2).

Accordingly, the Court finds and concludes that the consensual delegation of management authority to Mackinac by Messrs. Katzoff and Galligan under the Stipulation and Order and the Written Consent Resolutions and Amendment is permissible under Delaware law and the applicable Debtor's operating agreements. Thus, the "circumstances" that the UST argues leading to entry of the Stipulation and Order are insufficient to warrant vacatur under FRCP 60(b)(6).

      2.  <u>The Consensual Change to the Debtors' Management Structure is Appropriate and Permissible Under the Bankruptcy Code</u>

The UST further contends that (i) appointment of the CRO as manager of the Debtors was not done in compliance with applicable state law and (ii) the terms of the Stipulation and

Order and CRO Retention Application effectively permit the CRO to serve as a *de facto* chapter 11 trustee in violation of the Bankruptcy Code.  (*See* Supplemental Brief at 8; UST's Objection at 7.)

As an initial matter, the Debtors' rights under state law and the applicable operating agreements to alter their management structure postpetition is an appropriate exercise of their governance rights and permissible under the Bankruptcy Code.  Absent appointment of a chapter 11 trustee, those state law governance rights with respect to a Delaware LLC persist; and neither Delaware law nor the Bankruptcy Code gives the UST special rights to block the exercise or transfer of governance rights in the absence of appointment of a chapter 11 trustee.  In *In re Johns-Manville Corp.*, 801 F.2d 60 (2d Cir. 1986), the Second Circuit held that a chapter 11 proceeding did not prevent the right of shareholders to compel a shareholders' meeting for the purposes of electing a new board of directors.  *See Manville*, 801 F.2d at 63.  The circuit noted that the shareholders' right to govern their corporation is a "prerogative ordinarily uncompromised by reorganization" and that the "law of this circuit directs that the shareholders' natural wish to participate in this matter of corporate governance be respected."  *See id.* at 64.

As previously stated, the delegation of authority to the CRO pursuant to the Stipulation and Order and Written Consent Resolutions and Amendment is a permissible exercise of the Debtors' rights under state law.  The Court rejects the UST's arguments and follows well established precedent in this circuit to find that the Debtors' state law governance rights were not altered by the filing of these chapter 11 cases.

Relying on *In re Adelphia Comm. Corp.*, 336 B.R. 610, 664 (Bankr. S.D.N.Y. 2006), the UST argues that appointment of the CRO is impermissible under the Bankruptcy Code because the Stipulation and Order results in Boucher acting on behalf of the Debtors without any

independent oversight.  (UST Objection at 2–3.)  In *Adelphia*, Judge Gerber found that

"[a]ppointing a trustee equivalent . . . would be doing exactly what the Second Circuit told the

lower courts *not* to do: using section 105(a) 'to create substantive rights that are otherwise

unavailable under applicable law,' and to 'invent remedies that overstep statutory limitations.'"

336 B.R. at 664 (internal citations omitted) (emphasis in original).  At issue in the *Adelphia*

decision was an attempt by a Noteholders Committee to seek recusal by the debtors' directors

and to foist an "alternative fiduciary" on the debtors in lieu of a chapter 11 trustee.  *Id.* at 663.

That is not the case here, however, where the Court has neither been asked to remove the

Debtors' management nor appoint an independent fiduciary.  Rather, BSP and the Debtors have

requested that the Court approve a consensual delegation of authority by the Debtors' former

management to an independent CRO.

The UST also asserts that the CRO is a "responsible person," "accountable to no one."

(UST's Objection at 7.)  While the UST acknowledges that a CRO can be an "effective tool," it

sees a CRO as "a professional that must report to someone who is vested with ultimate

managerial authority for the debtor in possession."  (*Id.* at 7–8.)  The UST relies on a footnote

from a decision by this Court in *In re The 1030 Tax Group, LLC* for the proposition that the

Court lacks the power to appoint a "responsible person."  (*Id.* (quoting *In re 1031 Tax Group,

LLC*, No. 07–11448(MG), 2007 WL 2085384, at *3 n.4 (Bankr. S.D.N.Y. July 17, 2007)

("Sections 105(a) and 1107(a) may empower a bankruptcy court to prevent a debtor from

removing a manager, officer, or director, but they do not provide the Court with an independent

power of appointment.")).)  The UST misreads that footnote, which includes a discussion of *In re

Gaslight Club, Inc.*, 782 F.2d 767 (7th Cir. 1986).  In *Gaslight*, as here, the debtor's principal

agreed with creditors to the appointment of a third party "to exercise its debtor in possession

powers." *Id.* at 769. When the debtor's principal later changed course and sought to oust the third party, the court refused to appoint an alternative. *Id.* at 771. The initial designation of a responsible third party, with the consent of debtor and creditor, was permissible; it was the subsequent attempt at replacement that was not.

The Court finds that the scope of the CRO's duties under the CRO Stipulation is appropriate and not prohibited by the Bankruptcy Code. Accordingly, the consensual change to the Debtors' management structure was both appropriate and permissible under state law and the Bankruptcy Code and not "extraordinary relief" that warrants vacatur of the Stipulation and Order under FRCP 60(b)(6).

### C. Settlement of the Stay Relief Motion was Fair, Reasonable and in the Best Interest of the Debtors' Estates

The Debtors and BSP negotiated and entered into the CRO Stipulation in settlement of the Stay Relief Motion that was brought days after commencement of these cases and threatened to torpedo the Debtors' chances for a successful rehabilitation through the chapter 11 process. While not directly before the Court, the Court finds it appropriate to consider the merits of the settlement between the Debtors and BSP.

Settlements and "[c]ompromises are favored in bankruptcy" as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 10 COLLIER ON BANKRUPTCY ¶ 9019.01 (16th 2019)). Before approving a settlement, a court must determine that it "is fair and equitable and in the best interests of the estate." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (internal quotation marks omitted) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

20

"Courts have developed standards to evaluate if a settlement is fair and equitable and identified factors for approval of settlements . . . ." *In re Kerner*, 599 B.R. 751, 755 (Bankr. S.D.N.Y. 2019). The factors to be considered are interrelated and require the court to evaluate:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Id*. (quoting *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007)). "[W]hile the 'approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored.'" *JPMorgan Chase Bank, N.A. v. Charter Communs. Operating, LLC* (*In re Charter Communs*.), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (quoting *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y 2009)). In addition, the court may "give weight to the informed judgments of the trustee or debtor-in-possession and their counsel that a compromise is fair and equitable." *Kerner*, 599 B.R. at 756 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 505).

Here, as discussed above, the CRO Stipulation was entered in settlement of BSP's Stay Relief Motion. BSP purported to have been entitled, pursuant to the parties' credit agreement, to exercise management rights over the Debtors following actions by the Debtors constituting alleged events of default. (Stay Relief Motion ¶ 10.) BSP attempted to assert such management

rights in order to appoint CR3 Partners to manage the Debtors.[13]  (*Id.*)  At the First Day Hearing

counsel to BSP again asserted this line of argument, which was contested by counsel for the

Debtors.  (First Day Hr'g Tr., ECF Doc. # 49 at 17:20–19:6.)  It was apparent at that time, and

the Court noted, that BSP and the Debtors were firmly divided and could be headed toward

"nuclear war." (*Id.* at 48:22–23.)  The Court encouraged the parties to seek a consensual

agreement with respect to the possibility of a CRO and of some mutually agreed guidelines and

operating principles going forward in the Debtors' chapter 11 case.  (*Id.* at 62:19–23.)  This led

to the negotiated CRO Stipulation and the Court's subsequent approval of same pursuant to the

Stipulation and Order.

An analysis of the nonexclusive *Iridium* factors confirms that the Stipulation and Order

settling BSP's Stay Relief Motion should be approved.

    1.   <u>The Balance Between the Litigation's Possibility of Success and the
Settlement's Future Benefits</u>

The Debtors' likelihood of success was far from certain.  As discussed above, BSP's

assertion that Debtors were in default was contested, as was their right to exercise management

control over the Debtors.  Debtors argued that any events of default that may have occurred

under the credit agreement had been waived by BSP.  Moreover, with respect to attempts by BSP

to assert rights belonging to the Debtors under the Bankruptcy Code, uncertain legal issues

pertaining to blocking rights were likely to spur extensive litigation with uncertain an outcome.

*See* BSP Objection at 23 n.61; *see also generally* Kathryn A. Coleman, et al., *Blocking Use of*

*"Blocking Rights,"* 39 JUL AM. BANKR. INST. J. 30 (2020) (discussing the recent *In re Pace*

---

[13]    While apparently blindsided by the Debtors' filing of the chapter 11 petition in this case, BSP nevertheless
did not seek to have the case dismissed.  Instead, it sought permission to have the filing ratified by the manager that
BSP had initially attempted to install pursuant to their purported management rights triggered by events of default.
(First Day Hr'g Tr., ECF Doc. # 49 at 23:11–15, 46:17–24.)

*Industries* decision and the general policy disfavoring enforceability of contractual terms

purporting to give creditors veto rights over debtors' bankruptcy filings. *See In re Pace Indus.*

*LLC, et al.*, Case No. 20-10927 (MFW) (Bankr. D. Del. 2020)).

The settlement's future benefits are significant. As discussed above, at the First Day

Hearing the Court noted that the parties were engaged in a "death march" and poised for "nuclear

war." This settlement enabled the parties to abandon their standoff and begin productive

negotiations. It has allowed BSP and the Debtors to work "collaboratively to resolve several

operational, financial and administrative motions" and to focus "on a debtor-in-possession

financing agreement and the consensual use of cash collateral to fund the Debtors' operating and

administrative expenses during the pendency of these chapter 11 cases." (BSP Objection ¶ 22–

23.) This factor favors approval of the settlement.

2.  The Likelihood of Complex and Protracted Litigation

At the First Day Hearing the Court observed that if BSP and the Debtors continued in the

direction they were headed that it would likely lead to "nasty, drawn-out litigation." (First Day

Hr'g Tr. at 63:16.) A battle to replace the Debtors' management would have consumed far

greater litigation resources than the parties' consensual agreement to appoint a CRO. BSP was

attempting to assert full control over the Debtors' businesses and the Debtors had every intention

of fighting that claim of control. The dispute would have raised factual issues with respect to the

prepetition conduct of the Debtors' management, as it related to both the terms of the parties'

financing agreements and the Debtor-entities' operating agreements. The dispute also implicated

complex issues of Delaware law relating to limited liability company governance. This factor

also favors approval of the settlement.

### 3. Paramount Interests of Creditors; Support from Other Parties in Interest

The interests of creditors benefit from the appointment of a CRO in this case. BSP's willing participation in funding the Debtors' continued operations appears to be entirely necessary for the Debtors to have any continued viability. No other creditors have objected to the Stipulation and Order settling BSP's Stay Relief Motion. Only the UST has taken issue with this settlement.

Moreover, Messrs. Katzoff and Galligan own 90 percent of the equity of K.G. IM and were required to forego their management rights as a term of the settlement. Their support was clearly necessary to effect the settlement and they have willingly relinquished their management rights and consented the appointment and retention of Boucher and Mackinac.

### 4. Arm's-Length Bargaining; Competency and Experience of Counsel

The competency and experience of counsel to the Debtors and BSP is unquestioned.

After the First Day Hearing, BSP and the Debtors were given an opportunity to confer and attempt to reach a consensual path forward in this case. The record reflects that the parties engaged in good faith bargaining with respect to the CRO Stipulation, and there is no suggestion that the negotiations were in any way tainted. The Court is satisfied that the parties bargained at arm's length.

Execution of the CRO Stipulation was a sound exercise of the Debtors' business judgment. The Court concludes that, by the Stipulation and Order, reasonable and appropriate relief was approved in settlement of the dispute raised in the Stay Relief Motion regarding whether BSP succeeded to the rights to manage and govern the Debtors' affairs.

### D. The Debtors' Application to Retain and Employ Mackinac is Appropriate Under the Bankruptcy Code and a Sound Exercise of the Debtors' Business Judgment

The CRO Retention Application seeks entry of an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code authorizing the retention and employment of Mackinac and affirming the designation of the CRO. The UST does not challenge the Debtors' business judgment or the CRO's qualifications. The UST's Objection largely presents the same arguments set forth in the Reconsideration Motion with respect to the Debtors' state law governance rights and scope of the CRO's duties under the Bankruptcy Code. The Court will not repeat its conclusions here but emphasizes that the CRO's appointment (and retention) is a valid exercise of the Debtors' business judgment, pursuant to applicable state law, and appropriate under the Bankruptcy Code.

The balance of the UST's Objection concerns perceived failures of the arrangement between the Debtors and Mackinac to comply with the J. Alix Protocol. (UST's Objection at 8.) The UST summarizes the J. Alix Protocol, which originated from a settlement agreement between the UST and Jay Alix & Associates,[14] as describing the CRO as a hybrid, "part professional advisor and part operational decision maker." (*Id.* at 8.) The UST lauds the J. Alix Protocol as a "reliable framework for the continued postpetition employment of a financial advisor" that had been employed with the debtor prepetition, provided that the "CRO fully meets the disclosure and retention standards under Section 327" of the Bankruptcy Code. (*Id.* at 9.) The UST acknowledges that the Debtors have sought to disclose potential conflicts and have stated an intention to comply with the J. Alix Protocol. (*Id.* at 10.) But it remains the UST's

---

[14]    *See In re Safety-Kleen Corp.*, Case No. 00-2303 (Bankr. D. Del. 2000); for the full text of the J. Alix Protocol, see https://www.justice.gov/sites/default/files/ust/legacy/2014/08/11/J_Alix_Protocol_Engagement.pdf.

position that with no oversight from a board of directors Boucher retains too much "autonomy" and is therefore "an insider and not disinterested." (*Id.* at 10–11.)

The Debtors acknowledge that the text[15] of a relevant passage of the J. Alex Protocol refers specifically to a board of directors. (*Id.* ¶ 17.) The Debtors argue, however, that the mere fact that the Debtor-entities are organized as limited liability companies—and thus have no boards of directors—does "not undermine the fact that the Debtors' managers performed their duties and obligations in accordance with state law in appointing the CRO and providing the CRO with full authority over the Debtors." (*Id.* ¶ 18.)

The Debtors set forth two primary arguments to rebut the UST's assertion that "the CRO is an insider and therefore not disinterested." (*Id.* ¶ 21–24.) First, "the underlying premise of the Jay Alix Protocol is that while § 327(a) would prohibit the employment of the financial advisory firm due to a lack of disinterestedness, § 363(b) contains no such restriction." (*Id.* ¶ 22 (citing *In re Nine W. Holdings, Inc.*, 588 B.R. 678, 691 (Bankr. S.D.N.Y. 2018).) Moreover, the CRO Retention Application does in fact provide the section 327(a) disclosures typically required under the J. Alix Protocol. (*Id.* ¶ 23.)

Second, the insider status conferred by virtue of serving as a prepetition officer of a debtor simply does not act as a bar on retention of a CRO under the J. Alix Protocol; if it did, no prepetition CRO could serve as a postpetition CRO. (*Id.* ¶ 24.) The UST's assessment of the J. Alix Protocol elevates form over substance, and the Debtors take a more reasoned approach.

---

[15]    The quoted passage, Paragraph I.D. of the J. Alix Protocol, provides as follows:

Persons furnished by [the crisis manager] for executive officer positions shall be retained in such positions upon the express approval thereof by an independent Board of Directors whose members are performing their duties and obligations as required under applicable law ("Board"), and will act under the direction, control and guidance of the Board and shall serve at the Board's pleasure (*i.e.* may be removed by majority vote of the board).

Reply ¶ 17 (alteration in original).

The J. Alix Protocol can be an effective tool for minimizing potential conflict of interests, but it should not be read mechanically. The Debtors' lack of a board of directors does not categorically preclude them from utilizing a CRO during their chapter 11 case. Moreover, as Judge Chapman has noted, "[t]he Protocol is not a provision of the Bankruptcy Code. It is not law, and it is not binding on this Court or any other court." *In re Nine W. Holdings, Inc.*, 588 B.R. at 687–88). Any questions as to the J. Alix Protocol's validity notwithstanding, approval of the CRO Retention Application is consistent with the Protocol's spirit, in the best interests of the estate, and sought in the sound business judgment of the Debtors.

The CRO Retention Application and the Debtors' Objection sets out sound business reasons for retaining Mackinac and Boucher effectively in settlement of the Stay Relief Motion. Mackinac and Boucher began advising the Debtors over a year ago and are well positioned to continue doing so. (CRO Retention Application ¶ 8.) The CRO Retention Application and Engagement Letter set out a reasonable fee structure that was presumably negotiated by the parties. (*Id.* ¶ 12.) It also sets out a statement of "No Adverse Interest," disclosing Mackinac's previously earned compensation for work with the Debtors and addressing any potential conflicts. (*Id.* ¶¶ 19–25.) This appears to have been a heavily negotiated agreement that rises to the level of a reasonable business judgment as required by section 363(b) of the Bankruptcy Code. The Court finds and concludes that neither Mackinac nor Boucher has any adverse interest.

The Court finds that the Debtors' CRO Retention Application pursuant to Bankruptcy Code section 363(b) is consistent with the procedures routinely followed in this district.[16]

---

[16]     *See, e.g.*, *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. June 27, 2019); *In re Nine W. Holdings, Inc.*, 588 B.R. 678, 686 (Bankr. S.D.N.Y. 2018); *In re Enron Corp.*, No. 01-16034, 2006 WL 1030421, at *2 (Bankr. S.D.N.Y. Apr. 12, 2006).

Accordingly, the Court overrules the UST's objection and approves the CRO Retention

Application pursuant to section 363(b) of the Bankruptcy Code.

## IV.    CONCLUSION

For the reasons discussed herein, the Court restates its September 22, 2020 bench ruling

that **(i)** the Reconsideration Motion is **GRANTED** in part and **DENIED** in part; and **(ii)** the

UST's Objection is **OVERRULED** and the CRO Retention Application is **APPROVED**.

Orders have already been entered with respect to the relief approved in this Opinion.


Dated:      September 29, 2020
            New York, New York


                        *Martin Glenn*
                        _____
                        MARTIN GLENN
                        United States Bankruptcy Judge